Cecilia B. Connor, Esq.
Jennifer C. Barry, Esq.*
John V. Donnelly III, Esq.*
**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740
Email:  ConnorCe@sec.gov
Email:  BarryJ@sec.gov
Email:  DonnellyJ@sec.gov
*Not admitted in the U.S. District Court for the Southern District of New York

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : <br> : <br> : |
| **Plaintiff,** | : **Civil Action No. 20-cv-00447** |
| **v.** | : |
| | : **COMPLAINT** |
| **HILL INTERNATIONAL, INC., RONALD EMMA, and NICHOLAS TORNELLO,** | : <br> : **JURY TRIAL DEMANDED** |
| **Defendants.** | : |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") files this Complaint against defendants Hill International, Inc. ("Hill" or "Company"), Ronald Emma ("Emma"), and Nicholas Tornello ("Tornello") (collectively "Defendants") and alleges as follows:

### SUMMARY

1.    This action concerns accounting fraud and disclosure violations at Hill arising from repeated reporting errors and a failure to maintain accurate books and records.  This

misconduct led Hill to issue materially false and misleading financial statements from approximately May 2014 to March 2017.

2.      In May 2018, Hill restated its financial statements for the years 2014, 2015, and 2016, and the first quarter of 2017.  The correction of the errors resulted in a collective reduction to Hill's net earnings of more than $30 million for those periods.  Among other things, the restatement corrected accounting relating to foreign currency exchange losses, which Hill had handled improperly for years.

3.      The restatement also corrected material errors on Hill's books and records that Emma, Hill's Chief Accounting Officer, and Tornello, a senior accountant reporting to Emma, identified in May 2014, but failed to correct.

4.      In May 2014, Tornello identified approximately $5 million in foreign currency exchange losses on intercompany obligations that were incorrectly recorded on Hill's balance sheet, and which should have been recognized on its income statement.  If Hill had corrected these errors as soon as they were discovered, it would have negatively (and materially) impacted the Company's income.

5.      Emma and Tornello should have immediately recognized those losses on Hill's books and records but they did not.  Instead, between May 2014 and October 2014, Tornello wrote emails to Emma and others describing a plan to recognize $5 million in foreign currency losses over time.  This treatment was not in accordance with accounting principles generally accepted in the United States ("GAAP").

6.      In these emails, Tornello stated that he was "bleeding" the losses out over time and even joked about how they were not telling Hill's auditors about the errors when he wrote, "Once Ron [Emma] approves, I will forward to the auditors for review AAAAAAAAAAHHHH

just kidding[.]"  Significantly, despite knowing that there was a material issue that should be corrected, he wrote that his estimates "reflect that approximately $5.5M should be recognized as foreign exchange expense.  This is not my recommendation, however, given that various financial covenants are based on future earnings." (emphasis in original).

7.      In failing to correct the known errors, Emma and Tornello employed accounting that was not in accordance with GAAP and violated their professional obligations, Hill's internal controls, and Hill's internal policies and procedures.

8.      Emma and Tornello also violated the Company's internal controls and policies and procedures by failing to disclose their improper accounting treatment for the foreign currency exchange losses to appropriate personnel within the Company or Hill's auditors.

9.      As a result of Hill's historical accounting errors and the failure to correct the errors Tornello identified, Hill's income statement was materially false and its books and records were materially inaccurate.  Hill's reported income was materially overstated for more than three years.  During that time, relying on its materially incorrect financial statements, the Company raised over $40 million from unsuspecting investors via a secondary offering of common stock.

10.     After Emma retired and Tornello left the Company in the first quarter of 2017, others at the Company discovered the errors in its books and records which led to the Company's announcement in May 2018 that it would restate more than three years of financial statements.

11.     By the conduct described herein, Hill has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(2)-(3)] and Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)-(B)]

and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

12.     By the conduct described herein, Emma and Tornello have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)] and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.  By the conduct described herein, Emma and Tornello have also aided and abetted and, unless restrained and enjoined by this Court, will continue to aid and abet violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].  In addition, by the conduct described herein, Emma aided and abetted and, unless restrained and enjoined by this Court, will continue to aid and abet violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

14.     Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Defendants' conduct took place in connection with the offer and/or sale of Hill securities.  During the relevant period, Hill's common stock was publicly traded on the New York Stock Exchange, located in the Southern District of New York.  In addition, during the

relevant period, Hill maintained an office and transacted business in the Southern District of New York.

16.     Defendants, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce or of any facility of a national securities exchange in connection with the transactions, acts, practices, and courses of business described in this Complaint.

## DEFENDANTS

17.     **Hill** is incorporated in Delaware with a principal place of business in Philadelphia, Pennsylvania.  Hill is in the project and construction management consulting business, and has operations worldwide.  Since 2006, Hill has been registered with the Commission pursuant to Section 12(g) and then 12(b) of the Exchange Act.  During the relevant time period, Hill's common stock was traded on the New York Stock Exchange under the ticker symbol "HIL."  During the relevant period, Hill was audited by an independent accounting firm. In addition, during the relevant period, Hill maintained a Code of Ethics and Business Conduct ("Code of Conduct") and other internal policies and procedures that Hill's employees were required to follow.  Mainly, Hill required employees to keep accurate books and records and cooperate fully with internal and external audits.  The Code of Conduct notified employees that "[v]arious laws also require completeness and accuracy of our records," including the federal securities laws and rules and regulations of the SEC and the New York Stock Exchange.  The Code of Conduct also warned that:  "Any attempt to conceal or misstate information in Company records is a serious offense and may result in disciplinary action and criminal prosecution."

18.     **Ronald Emma**, age 68, is a resident of Moorestown, New Jersey.  From 1980 until his retirement in February 2017, Emma served as Hill's Chief Accounting Officer.  Emma obtained a Certified Public Accountant ("CPA") license in 1979, which was active until 2017.

19.     **Nicholas Tornello**, age 32, is a resident of Runnemede, New Jersey.  Tornello worked at Hill from 2009 until March 2017.  During that period, Tornello held a number roles of increasing responsibility, including Staff Accountant, Senior Accountant, and Senior Financial analyst.  In 2015, Tornello was promoted to Hill's Director of Internal Reporting and in 2016, he was promoted to Assistant Corporate Controller, a role in which he served until he left the company in March 2017.  From March 2017 until he was terminated in May 2019, Tornello was employed as Finance Controller – Americas for a company involved in the commercial services industry.  Tornello is currently employed in the accounting department of a company that sells and repairs industrial equipment.  In 2013, Tornello obtained a CPA license, which remains active.

### FACTS

20.     In 2006, Hill became a public company through a reverse merger, and the Company experienced substantial international growth, adding operations in numerous countries that use currencies other than the U.S. Dollar.  That same year, Hill hired a Chief Financial Officer ("the CFO") who had previously served as Chief Accounting Officer for another New York Stock Exchange listed company.  From that point until his retirement in 2017, Emma reported to the CFO.

21.     As a result of Hill's international growth, Hill's business was impacted by fluctuations in foreign currency exchange rates.  Hill's foreign subsidiaries typically utilized their respective local currency (rather than the U.S. Dollar) as their "functional currency," the

currency in which they kept their books and records.  Accordingly, fluctuations in foreign currency exchange rates could cause foreign currency exchange losses on intercompany loans made between and among Hill and its subsidiaries that used different currencies in their accounting.

22.     Because the performance of its subsidiaries was consolidated into Hill's financial statements, the foreign currency exchange losses incurred by its foreign subsidiaries negatively impacted Hill's financial statements.

23.     Under GAAP, determining whether foreign currency losses on intercompany loans should be classified as Accumulated Other Comprehensive Loss ("AOCL") on the balance sheet or included as expenses on the income statement depends on whether the obligation is of a long-term investment nature.

24.     Any foreign currency losses on obligations where settlement is not planned or anticipated in the foreseeable future should be considered of a long-term investment nature and included as AOCL on the balance sheet.  Conversely, foreign currency losses on obligations where repayment is foreseeable are not of a long-term investment nature and should be reflected as expenses on the company's income statement.

25.     Hill, as a publicly traded company, represented to investors that it followed GAAP and it was required by the federal securities laws to follow GAAP when preparing and presenting its financial statements.

26.     Hill maintained a written policy that followed GAAP on the accounting treatment of foreign currency exchange losses.

27.     Prior to the second quarter of 2017, however, in practice, Hill failed to follow GAAP and its own written policy for the accounting treatment of intercompany foreign currency

exchange losses. Hill's accounting team mistakenly adopted a standard where foreign currency losses on intercompany obligations where repayment was expected to occur in more than one year were classified as AOCL on the balance sheet—without consideration of the foreseeability of the repayment of the loan. Therefore, only foreign currency exchange losses on obligations where repayment was expected in less than one year were included as expenses on the income statement. As a result of its failure to comply with GAAP and its own policy, the Company restated its financial statements to correct the errors.

### A. Tornello Identified Material Errors in Hill's Accounting, but Emma and Tornello Failed to Correct Those Errors or Disclose Them to the CFO or Hill's Auditors

28.     In 2014, Emma organized a meeting in Daresbury, United Kingdom (the location of Hill's subsidiary in the United Kingdom) to address the growing complexity of Hill's accounting due to its increasingly global structure. The meeting was attended by individuals employed within Hill's accounting department, including Emma and Tornello, but not the CFO. Following the meeting, Emma assigned Tornello to conduct a detailed analysis of Hill's AOCL balance.

29.     In an email dated May 30, 2014 to Emma and copied to another member of the accounting team, Tornello discussed his analysis of Hill's AOCL balance, noting that Hill was carrying a deficit in excess of $23 million as of April 30, 2014.

30.     In his email, even under the flawed methodology Hill had been applying to account for foreign currency exchange losses on intercompany transactions, Tornello identified approximately $5 million in foreign currency exchange losses that were erroneously included in Hill's AOCL balance that Hill should have corrected.

31.     Tornello noted that the approximately $5 million loss derived from three categories: (1) foreign currency exchange losses on intercompany notes in which either all or a

majority of the note had already been paid; (2) foreign currency exchange losses on
intercompany accounts payables that were inappropriately classified as long term; and (3)
foreign currency losses related to a project Hill had performed in Libya that had concluded.

32.     Shortly thereafter, Emma responded by email, thanking Tornello and stating:
"We'll review when I get back."

33.     Accordingly, by approximately May 30, 2014, Emma and Tornello should have
known that the AOCL appearing on Hill's balance sheet, and correspondingly Hill's previously
reported expenses and net income, were materially inaccurate, required immediate correction,
and required restatement.

34.     Nevertheless, Emma and Tornello failed to correct these known errors or inform
the CFO or others in accordance with Hill's policies and procedures and the Company's Code of
Conduct.  Instead, Emma and Tornello permitted Hill to keep these known errors on its books
and records.

35.     For the known errors related to the foreign currency exchange losses attributable
to intercompany loans, Tornello improperly attempted to "bleed" out those losses over time by
recognizing certain losses, but not others, as expenses in months where there were offsetting
foreign currency exchange gains from other operations.  But the majority of these loans had
already been paid and the entire associated foreign currency exchange loss was required to be
recognized on Hill's income statement.

36.     For intercompany accounts payable, Hill employees, including Tornello, with the
approval of Emma, had—prior to May 2014—routinely circumvented Hill's accounting controls
and manually reclassified foreign currency exchange losses relating to certain accounts payable
from the income statement to AOCL.  The employee had to manually override the system to

reclassify these losses as AOCL because Hill's accounting software automatically included such losses in Hill's income statement.

37.     This practice of manually overriding the accounting controls and reclassifying certain of the foreign currency exchange losses to AOCL was authorized and approved by Emma.

38.     In overriding Hill's accounting controls for these reclassifications, Tornello did not conduct any independent research as to whether the reclassification was appropriate, nor did he follow Hill's written policy regarding foreign currency exchange losses on intercompany obligations.  Instead, he picked and chose entries to reclassify to make Hill's financial performance look better.

39.     Although Tornello had concluded in May 2014 that the reclassifications were not proper and that Hill should recognize these losses on its income statement, he failed to make the appropriate journal entries.  Instead, he improperly attempted to recognize these losses into the income statement over time.

40.     As Hill's Chief Accounting Officer, Emma approved the accounting journal entries booked by Tornello.

41.     Tornello's own emails demonstrate his misconduct.  For example:

- In May 2014, Tornello noted that approximately $3.5 million of the foreign currency exchange losses "represents manual journal entries that we reclassified from the P&L to the Balance sheet.  I'll let [Emma] explain this one. ;)"

- In July 2014, in discussing the impact of correcting the accounting errors he had identified, Tornello estimated approximately $4.9 million should be transferred from the AOCL to the income statement; Tornello wrote:  "Once Ron [Emma] approves, I will forward to the auditors for review.  AAAAAAAAAAHHHH just kidding[.]"

- In September 2014, Tornello wrote that he had been working with an individual at Hill's subsidiary in Greece to clean up the AOCL "little by little each month, as taking a $5.0M hit in one month may not be prudent given any circumstance."

- In that same September 2014 email Tornello also noted that "roughly 40%" of the $5 million "AOCI hit" he referenced in the email derived from incorrect accounting regarding intercompany loans that had already been, at least partially, paid.  He stated that Hill still had exposure on older notes and that he was "attempting to 'bleed' these out over time."

- In a separate September 2014 email, Tornello wrote that his estimates "reflect that approximately $5.5M should be recognized as foreign exchange expense.  This is not my recommendation, however, given that various financial covenants are based on future earnings." (emphasis in original).

- In October 2014, Tornello wrote another email summarizing the status of the AOCL accounting errors and his plan to gradually recognize the losses.  Again, Tornello stated that the plan was to decrease the inflated AOCL balance over time, and that it was not his recommendation that Hill recognize the approximately $5 million as foreign exchange expense due to the impact it could have on the Company's financial covenants.

42.     Emma forwarded Tornello's October 2014 email analyzing the AOCL balance to Tornello's unofficial mentor at Hill, who, at that time, was the Company's Vice President of Corporate Planning and Development ("Corporate VP").  According to Tornello, following the Corporate VP's receipt of the forwarded email, either Emma or the Corporate VP instructed him to stop preparing and circulating the AOCL analysis.

43.     Although Tornello stopped preparing and emailing the detailed breakdown of the AOCL balance, he continued his improper efforts to gradually recognize the inflated AOCL balance.

44.     Emails circulated to the CFO regarding the AOCL balance did not describe the improper accounting treatment employed or the plan to "bleed out" the inflated AOCL balance over time.

45.     Even after October 2014, Emma and Tornello continued to fail to disclose to the appropriate personnel within Hill or Hill's auditors the known accounting errors or Tornello's efforts to gradually recognize the foreign currency exchange losses.

46.     In conducting the fiscal year 2016 audit, Hill's auditors interviewed Tornello about the risk of a material misstatement and risk of fraud in Hill's financial statements.  Even though Tornello knew that Hill's books and records included the errors in the AOCL account, Tornello did not disclose that fact to the auditors and stated he was unaware of a misstatement or risk of fraud.

**B.  After Emma and Tornello Had Identified the Material Errors in Hill's Accounting, Hill Conducted an Offering of Securities Using the Materially False Financial Statements**

47.     On August 6, 2014, Hill raised over $40 million from unsuspecting investors by completing a secondary offering of 9,546,629 shares of its common stock.  The prospectus for that offering incorporated by reference, among other filings, the materially misstated financials contained in Hill's 2013 annual report on Form 10-K, filed with the Commission on March 14, 2014, the quarterly report on Form 10-Q, as filed on May 12, 2014, and current report on Form 8-K dated July 28, 2014.

48.     Reasonable investors would have considered and relied on the information in these public filings when deciding whether to buy or sell Hill securities.

**C.  After Hill Discovered the Errors Previously Identified but not Corrected by Emma and Tornello, Hill Corrected the Material Errors and Restated its Financial Statements**

49.     In December 2016, Hill announced that it had entered into a definitive stock purchase agreement to sell its Construction Claims Group.  The transaction closed on May 5, 2017, after Emma had retired and Tornello had left Hill.

50.     In connection with Hill's post-sale review of the accounting with respect to this sale, a member of Hill's corporate finance department discovered that Hill had improperly accounted for certain foreign currency exchange losses on intercompany transactions dating back as far as 2009.  Therefore, Hill's Form 10-K and 10-Q, as well as its announcements of interim results on Form 8-K contained inaccuracies throughout this time period.

51.     On September 21, 2017, Hill announced that its financial statements for each of the years ended December 31, 2014, 2015, and 2016 and the quarters ended March 31, June 30, and September 30 in both 2015 and 2016, and the quarter ended March 31, 2017 could no longer be relied upon, and required restatement.  Hill further stated that the anticipated adjustments would result in increases to reported expenses, decreases in operating profit, decreases in AOCL, and decreases in retained earnings.

52.     On news of the impending restatement, Hill's stock price dropped.  Over three trading days, the price of Hill's stock fell from $4.95 per share to $4.60 per share.

53.     Subsequently, the Company conducted an internal investigation and self-reported to the SEC.  Due to the inaccuracies in its financial statements, Hill restated its financial statements affected by the improper accounting.

**D.  Hill, Emma, and Tornello Violated the Federal Securities Laws**

54.     By engaging in the conduct described above, Hill, Emma, and Tornello violated the federal securities laws.

55.     For years, Hill failed to properly account for its foreign currency exchange losses on intercompany transactions.  In addition, Hill failed to correct known, material errors on its books and records after Tornello identified them.  As a result, Hill's books and records were materially misstated for more than three years.

56.     Accordingly, in August 2014, Hill made materially false and misleading statements when it distributed a prospectus that incorporated by reference many of the inaccurate and materially flawed annual and quarterly reports to unsuspecting investors from whom it raised over $40 million by completing a secondary offering of 9,546,629 shares of its common stock.

57.     By engaging in the conduct described above, Hill, directly or indirectly, filed or caused to be filed with the Commission and disseminated to investors false and misleading annual reports and quarterly reports, and accompanying certifications pursuant to section 302 of the Sarbanes-Oxley Act of 2002, each containing untrue statements of material facts or which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.     In addition, Hill failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

59.     Emma violated the federal securities laws, GAAP, Hill's internal controls, and Hill's policies and procedures by failing to ensure that Hill correctly accounted for the foreign currency exchange losses and by failing to immediately correct the accounting errors that had been identified.

60.     Emma should have followed GAAP as reflected in Hill's written policy for accounting for intercompany foreign currency exchange losses.  Likewise, Emma should have ensured that Tornello followed Hill's written policy and proper GAAP accounting and made the necessary corrections on Hill's books and records regarding the known errors.  Emma should not have allowed Tornello to "bleed" out those losses.

61. Likewise, Emma should not have allowed Tornello to circumvent Hill's accounting controls by overriding those controls when he picked and chose foreign currency exchange losses on intercompany payables to manually reverse and move from Hill's income statement to its AOCL balance.

62. As Hill's Chief Accounting Officer, Emma had responsibility for the errors in Hill's financial statements. Emma signed the public filings containing those errors.

63. In addition, as Hill's Chief Accounting Officer, Emma failed to devise and maintain a system of internal accounting controls at Hill sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP. On the contrary, he authorized Tornello and others to circumvent Hill's internal controls and manually reclassify certain intercompany foreign exchange losses from Hill's income statement to its balance sheet.

64. Tornello violated the federal securities laws, GAAP, Hill's internal controls, and Hill's policies and procedures by failing to correct the errors he had identified. Tornello should have followed GAAP as reflected in Hill's written policy for accounting for foreign currency exchange losses.

65. Moreover, Tornello should not have engaged in "bleeding" out the foreign currency exchange losses. Tornello should have immediately corrected the accounting errors he had identified.

66. Tornello should not have circumvented Hill's accounting controls by picking and choosing foreign currency exchange losses on intercompany payables to manually reclassify expenses on Hill's income statement to its AOCL balance.

67.     In addition, to the extent Emma refused to correctly account for the losses

Tornello had identified, Tornello violated Hill's internal controls and Hill's policies and

procedures by failing to escalate the known accounting errors and improper accounting to others

in the Company, such as the CFO, the audit committee of the Board of Directors, or Hill's

whistleblower hotline.

68.     Tornello participated in preparing the journal entries, balance sheets, and income

statements that formed the basis for the erroneous financial information that appeared in Hill's

publicly filed financial statements.

69.     Hill, Emma, and Tornello allowed the false financial statements to be

disseminated to investors in numerous public filings.  By drafting, making, and disseminating

various materially false statements, both internally and in Hill's financial statements included in

its periodic filings and offering documents, Hill, Emma, and Tornello engaged in an "act,

practice or course of business" that "operated as a fraud or deceit" on investors.

70.     The materially false and misleading financial statements issued by Hill

significantly altered the total mix of information available to investors, which reasonable

investors would have deemed important to making an informed investment decision.

71.     In addition, Emma and Tornello provided substantial assistance in connection

with Hill's violations of the federal securities laws.

### FIRST CLAIM FOR RELIEF
### Hill Violated Section 17(a)(2) of the Securities Act

72.     The Commission re-alleges and incorporates by reference each and every

allegation in paragraphs 1 through 71 inclusive, as if they were fully set forth herein.

73.     Hill, by engaging in the conduct described above, knowingly, recklessly, or

negligently, directly or indirectly, in connection with the offer or sale of securities, by the use of

means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     By engaging in the conduct described above, Defendant Hill violated, and unless restrained and enjoined will again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## SECOND CLAIM FOR RELIEF
### Hill, Emma, and Tornello Violated Section 17(a)(3) of the Securities Act

75.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 71 inclusive, as if they were fully set forth herein.

76.     Defendants Hill, Emma, and Tornello, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

77.     By engaging in the conduct described above, Defendants Hill, Emma, and Tornello violated, and unless restrained and enjoined will again violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

### THIRD CLAIM FOR RELIEF
**Hill Violated Section 13(a) of the Exchange Act and
Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder**

78.     The Commission re-alleges and incorporates by reference each and every

allegation in paragraphs 1 through 71 inclusive, as if they were fully set forth herein.

79.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules

13a-1, 13a-11, and 13a-13 require issuers of registered securities to file with the Commission

factually accurate annual and quarterly reports.  Exchange Act Rule 12b-20 [17 C.F.R.

§ 240.12b-20] further provides that, in addition to the information expressly required to be

included in a statement or report, there shall be added such further material information, if any,

as may be necessary to make the required statements, in the light of the circumstances under

which they were made, not misleading.

80.     By engaging in the conduct described above, Defendant Hill, directly or

indirectly, filed or caused to be filed with the Commission and disseminated to investors false

and misleading annual reports and quarterly reports, and accompanying certifications pursuant to

section 302 of the Sarbanes-Oxley Act of 2002, each containing untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading.

81.     By reason of the foregoing, Hill, directly or indirectly, violated and, unless

restrained and enjoined, will continue to violate Section 13(a) of the Exchange Act and Rules

12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20,

240.13a-1, 240.13a-11, and 240.13a-13].

## FOURTH CLAIM FOR RELIEF
### Emma and Tornello Aided and Abetted Hill's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13

82.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 71 and 78 through 81 inclusive, as if they were fully set forth herein.

83.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 13a-1, 13a-11, and 13a-13 require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports.  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

84.     Hill filed with the Commission and disseminated to investors false and misleading annual reports in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder [15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

85.     Defendants Emma and Tornello knowingly or recklessly provided substantial assistance to Hill in its violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder [15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

86.     By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Emma and Tornello aided and abetted Hill's violations and, unless restrained and enjoined, will in the future aid and abet violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

### FIFTH CLAIM FOR RELIEF
**Hill Violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**

87.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 71 inclusive, as if they were fully set forth herein.

88.     Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets.  Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

89.     By engaging in the conduct described above, Hill violated and, unless restrained and enjoined, will continue to violate Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78(m)(b)(2)(B)].

### SIXTH CLAIM FOR RELIEF
**Emma and Tornello Aided and Abetted Hill's Violations of**
**Section 13(b)(2)(A) of the Exchange Act**

90.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 71 and 87 through 89 inclusive, as if they were fully set forth herein.

91.     By engaging in the conduct described above, Defendants Emma and Tornello knowingly or recklessly provided substantial assistance to Hill in its failure to make and keep accurate books, records, and accounts.

92.     By engaging in the conduct described above, Defendants Emma and Tornello aided and abetted Hill's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

93.     Defendants Emma, and Tornello, by engaging in the conduct described above, knowingly or recklessly provided substantial assistance to Hill in its violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

94.     By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Emma and Tornello aided and abetted Hill's violations and, unless restrained and enjoined, will in the future aid and abet violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## SEVENTH CLAIM FOR RELIEF
### Emma Aided and Abetted Hill's Violations of Section 13(b)(2)(B) of the Exchange Act

95.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 71 and 87 through 89 inclusive, as if they were fully set forth herein.

96.     By engaging in the conduct described above, Emma provided substantial assistance to Hill in its failure to devise and maintain a sufficient system of internal accounting controls.

97.     By engaging in the conduct described above, Emma knowingly or recklessly provided substantial assistance to Hill in its violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

98.     By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Emma aided and abetted Hill's violations and, unless restrained and enjoined, will in the future aid and abet violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §  78m(b)(2)(B)].

## EIGHTH CLAIM FOR RELIEF
### Emma and Tornello Violated Section 13(b)(5) of the Exchange Act

99.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 71 inclusive, as if they were fully set forth herein.

100.     Emma and Tornello, by engaging in the conduct described above, directly and indirectly, knowingly circumvented Hill's system of internal accounting controls.

101.     By engaging in the conduct described above, Emma, and Tornello violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## NINTH CLAIM FOR RELIEF
### Emma and Tornello Violated Rule 13b2-1 of the Exchange Act

102.     The Commission re-alleges and incorporates by reference each and every

allegation in paragraphs 1 through 71 inclusive, as if they were fully set forth herein.

103.     During the period 2014 through 2016, Emma and Tornello, directly and

indirectly, falsified and caused to be falsified Hill's books and records.

104.     By engaging in the conduct described above, Emma, and Tornello violated, and

unless restrained and enjoined will again violate, Rule 13b2-1 under the Exchange Act [17

C.F.R. § 240.13b2-1].


## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that the Court:

### I.

Permanently enjoin Hill from violating Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)], Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b)

and 78m(b)(5)], and Rules 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1, and 13b2-2 thereunder [17

C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13];

### II.

Permanently enjoin Emma from violating Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)] and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1

thereunder [17 C.F.R. § 240.13b2-1], and from aiding and abetting violations of Sections 13(a)

and 13(b)(2)(A)-(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)-(B)] and Rules

12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11,

and 240.13a-13).

### III.

Permanently enjoin Tornello from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1], and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13).

### IV.

Order that Hill, Emma, and Tornello pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court, plus post-judgment interest; and

### V.

Grant such further relief as the Court may deem just and appropriate.

Respectfully submitted,

By: *Cecilia B. Connor*

Cecilia B. Connor, Esq. (CC1484)
Jennifer C. Barry, Esq.*
John V. Donnelly III, Esq.*
Securities and Exchange Commission
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100
Facsimile: (215) 597-2740
Email:  BarryJ@sec.gov
Email:  DonnellyJ@sec.gov
Email:  ConnorCe@sec.gov

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**

**\*Not admitted in S.D.N.Y.**

Dated: January 16, 2020